### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                                                    PLAINTIFF

v.                                                                                                       No. 3:24-cr-62-BJB

QUANTAVIOUS O'BANNON                                                                                     DEFENDANT

#### ORDER DENYING THE MOTION TO DISMISS THE INDICTMENT

The Government indicted Quantavious O'Bannon for possessing a gun as a felon in violation of 18 U.S.C. § 922(g)(1). DN 1. O'Bannon asks the Court to dismiss the indictment, arguing that § 922(g)(1) is unconstitutional as applied to him. But because O'Bannon's record indicates that he's dangerous, Congress may—consistent with the right to keep and bear arms codified in the U.S. Constitution's Second Amendment—lawfully disarm him under § 922(g)(1). So the Court denies O'Bannon's motion to dismiss.

#### I.   Indictment

Louisville Police officers discovered O'Bannon on a list of unserved arrest warrants. His active warrant concerned charges of receiving stolen property, fleeing police, and reckless driving. LMPD Investigative Report (DN 16-1) at 1. Louisville Police officers executing the warrant surveilled O'Bannon's residence, confronted him when he left, and arrested him. *Id.* When they did, they found a loaded Glock 35 with an extended magazine in his waistband. *Id.* at 2. At the police station, O'Bannon's lengthy criminal history became apparent: it includes several felony convictions for first-degree fleeing, evading police, third-degree burglary, and other offenses. *Id.* at 4.

The United States indicted O'Bannon for possessing the gun, DN 1, despite being a convicted felon prohibited from doing so, 18 U.S.C. § 922(g)(1). O'Bannon moved to dismiss the indictment, contending that § 922(g)(1) violates the Second Amendment as applied to him. The government may not prosecute him under § 922(g)(1), O'Bannon argues, because he is not a "dangerous" felon and therefore remains protected by the constitutional right to keep and bear arms. *See United States v. Williams*, 113 F.4th 637 (6th Cir. 2024).

#### II.  The Second Amendment and § 922(g)(1)

The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms,

1

shall not be infringed." Those words, the Supreme Court has held, protect an individual's right to possess a firearm for lawful purposes, like self-defense. *See Williams*, 113 F.4th at 643 (citing *District of Columbia v. Heller*, 554 U.S. 570, 579–81, 592, 625, 627 (2008)). But the common-law right to keep and bear arms, codified in the Second Amendment, was "not unlimited." *Id.* (quoting *Heller*, 554 U.S. at 626). And judges today don't define the contours of the right based on their own textual gloss or value judgments; they do so by examining the pre- and post-ratification history and tradition of gun rights to inform their application to contemporary regulatory restrictions. *United States v. Silvers*, 671 F. Supp. 3d 755, 763 (W.D. Ky. 2023). Those regulations that are consistent with the "principles that underpin" our "nation's historical tradition of firearm regulation" do not offend the Second Amendment, the Supreme Court has explained, because they respect the scope of this fundamental right as protected by the First Congress and the States. *United States v. Rahimi*, 602 U.S. 680, 692 (2024); *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 20 (2022).

The contours of that right have become clearer in recent years thanks to the work of scholars and appellate judges. The Court has held that laws completely banning handgun possession in the home are incompatible with the right to keep arms—whether protected directly via the Second Amendment against the Federal Government, *see Heller*, 554 U.S. at 635, or incorporated against the States via the Fourteenth, *see McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010). In *Bruen*, the Court held that permitting laws limiting possession only to those the Government determined had a "special need" were likewise incompatible with the right. *See* 597 U.S. at 11. And in *Rahimi*, the Court determined that Congress could lawfully disarm individuals subject to a properly entered domestic-violence restraining order. 602 U.S. at 693, 701 n.2. Section 922(g)(8), the Court explained, was analogous to "surety"[1] and "going armed"[2] laws, which historical legislatures used to disarm individuals who "pose[d] a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698.

Efforts to disarm those deemed prone to violence feature prominently in historical regulations burdening the Second Amendment right. Many of those regulations—like the surety and going armed laws—specifically targeted individuals whose possession of weapons (in the eyes of the legislature, anyway) posed a danger

---

[1] Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond" subject to forfeiture if the individual "broke the peace." *Rahimi*, 602 U.S. at 695. These laws "targeted the misuse of firearms" by, for example, authorizing the imposition of bonds from individuals who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." *Id.* at 696 (cleaned up).

[2] "Going armed" laws prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 697 (cleaned up).

to the community. *See Silvers*, 671 F. Supp. 3d at 770–71 (collecting sources). Indeed, colonial and state governments often disarmed, "on a groupwide basis," *id.* at 769, whole categories of individuals whom the legislature deemed dangerous to the public safety. *See Williams*, 113 F.4th at 650–57. As the Sixth Circuit recently explained, history "shows that governments may use class-based legislation to disarm people it believes are dangerous." *Id.* at 661–62.

Yet the legislative authority to regulate on a classwide basis didn't preclude individual members of the disarmed class to challenge that generalization. Citizens could do so, for example, by swearing a loyalty oath (for Catholics—a group suspected of undermining the colonial-era civil authorities), *id.* at 651, or by obtaining "a certificate from a justice of the peace" (after emancipation from slavery) attesting that the individual is "an orderly and peaceable person," *id.* at 656 (quotation omitted).

As the Sixth Circuit has recently and repeatedly held, § 922(g)(1) fits within that historical tradition. *Id.* at 662–63; *United States v. Morton*, 123 F.4th 492, 499–500 (6th Cir. 2024); *United States v. Parham*, 119 F.4th 488, 495–96 (6th Cir. 2024). The legislature may disarm convicted felons from possessing firearms on a classwide basis based on their perceived dangerousness, *Williams*, 113 F.4th at 657, but individual felons may challenge that dangerousness classification. *See, e.g.*, *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (food-stamp fraudster retained Second Amendment rights) (en banc). The Constitution guarantees those individuals, like the Catholics and freedmen of old, the chance to demonstrate that they aren't specifically dangerous and thus fall outside Congress's general limitation.

Section 922(g)(1), of course, bars felons from possessing weapons without providing a procedural mechanism for individual felons to demonstrate their entitlement to Second Amendment protections. The Sixth Circuit has held, however, that "[d]istrict judges" may serve that function "when they entertain as-applied challenges to § 922(g)(1)'s applicability." *Williams*, 114 F.4th at 657 (citing *United States v. Jackson*, 85 F.4th 468, 478–79 (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc)). In such cases, the defendant bears the burden to demonstrate non-dangerousness, and the reviewing court may consider his "entire criminal record"—including any "judicially noticeable information."[3] *Id.*; *id.* at 660.

---

[3] Judicially noticeable information is information "that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(2).

3

### III. O'Bannon's Challenge

O'Bannon is one such defendant. He challenges § 922(g)(1) as applied to him, arguing that he's not a dangerous felon. Therefore he can't be disarmed consistently with the Second Amendment. Motion to Dismiss (DN 14). But the facts available to the Court, at least at the motion-to-dismiss stage, indicate otherwise: O'Bannon's criminal history indicates that he's a dangerous felon. And he hasn't presented any countervailing evidence that might outweigh that record.

O'Bannon has several prior felony convictions. Much of that history appears on the face of the indictment: three convictions for first-degree fleeing and evading police, three convictions for receiving stolen property, and one conviction each for third-degree burglary and second-degree escape. Indictment at 1–2. The District Court, of course, presumes the truth of those facts as alleged in an indictment at the motion-to-dismiss stage. *See United States v. Reed*, 77 F.3d 139, 140 n.1 (6th Cir. 1996) (en banc). The Government, moreover, attached judicially noticeable documentation for those offenses to its Response Brief.[4] *See* DNs 16-2, 16-4, 16-6. And O'Bannon's online-offender profile, maintained by the Kentucky Department of Corrections, lists some (albeit not all) of the offenses recounted in the indictment. *See* http://kool.corrections.ky.gov/KOOL/Details/524113.

Do these prior felonies indicate dangerousness and take O'Bannon's conduct outside the Second Amendment's protection? The Sixth Circuit's decision in *Williams* indicates that violent crimes—historical "crimes against the person" like murder, rape, and robbery—are "strong evidence that an individual is dangerous, if not totally dispositive on the question." 113 F.4th at 658. And offenses like "drug trafficking" and "burglary" "put someone's safety at risk, and thus, justify a finding of danger." *Id.* at 659. "[W]hile not strictly crimes against the person," they "may nonetheless pose a significant threat of danger." *Id.* A defendant with convictions in these two

---

[4] The Government also submitted police reports from some of the offenses. Those reports include a narrative that summarizes the manner in which police say O'Bannon committed each offense. Courts in this Circuit remain split on whether such reports—unsworn and potentially unreliable—are susceptible to judicial notice at this stage of a prosecution. *See Eubank v. Wesseler*, No. 10-210, 2011 WL 3652558, at *3 n.2 (E.D. Ky. Aug. 19, 2011) ("The vast majority of cases hold that police reports do not constitute matters of public record appropriate for judicial notice."); *United States v. Johnson*, No. 2:23-cr-20569, 2025 WL 226957, at *3–4 (E.D. Mich. Jan. 16, 2025) (reports contain "allegations of uncharged conduct, hearsay, and similar information whose reliability cannot be assumed"); *United States v. Sykes*, No. 3:19-cr-60, 2025 WL 52737, at *2 n.3 (M.D. Tenn. Jan. 8, 2025) (considering police report in *Williams* challenge); *United States v. Harris*, No. 24-45, 2024 WL 5090457, at *2 (E.D. Ky. Dec. 12, 2024) (same). True, the Court is "not confined to the fact of conviction alone," and "may consider how an offense was committed." *Morton*, 123 F.4th at 499 (citing *Williams*, 113 F.4th at 663). But here considering the police reports is unnecessary to determine whether the record supports O'Bannon's dangerousness determination.

4

categories "will have a very difficult time, to say the least, of showing he is not dangerous." *Id.* at 663.[5]

O'Bannon's first-degree fleeing-and-evading convictions—standing by themselves—would suffice under this binding caselaw. Under Kentucky law, an individual commits this offense either on foot or in a vehicle. Pedestrian fleeing and evading is complete when a person "knowingly or wantonly disobeys" a police officer's order to stop, and either just committed "an act of domestic violence" or causes "serious physical injury or death to any person or property." K.R.S. § 520.095(1)(b). For motor-vehicle fleeing, a person must knowingly disobey a police officer's order to stop in combination with one or more of the following conditions: the person just committed "an act of domestic violence," is driving "under the influence of alcohol or any other substance," the person is driving with a suspended license, or the person either causes "or creates substantial risk" of serious harm to people or property. § 520.095(1)(a). Other than the police reports, *see* note 4 above, nothing in the record indicates which of these aggravating circumstances earned O'Bannon his first-degree convictions. But the Court does not need to identify that information to conclude that these felonies indicate dangerousness.

O'Bannon has convictions for both types of fleeing and evading. O'Bannon's conviction in case 19-CR-3343 was for "motor vehicle" fleeing and evading. *See* Pretrial Diversion Order (DN 16-2) at 2.[6] And his convictions in cases 22-CR-1915 and 23-CR-896 are for the pedestrian variety. *See* Judgment of Conviction, 22-CR-1915 (DN 16-4) at 1; Judgment of Conviction, 23-CR-896 (DN 16-6) at 1.[7] As discussed above, the first-degree nature of these convictions mean that O'Bannon fled police in combination with one or more aggravating circumstances, like causing a substantial risk of serious harm to other people or property.

---

[5] A third category, not relevant here, are crimes that cause "no physical harm to another person or the community" like "mail fraud" or "making false statements." *Williams*, 113 F.4th at 659.

[6] The Government's documentation in case 19-CR-3343 is an "order granting pretrial diversion" rather than a conviction. And according to the order's terms, the charges would have been "designated as Dismissed-Diverted" had O'Bannon "successfully completed" the diversion program. Pretrial Diversion Order at 3. O'Bannon's online offender profile, however, shows that he was convicted in this case on May 7, 2024. *See* http://kool.corrections.ky.gov/KOOL/Details/524113. This conviction, therefore, is relevant to the Court's dangerousness determination.

[7] No record of O'Bannon's conviction in 23-CR-896 appears in his online offender profile. But the signed, certified judgment in that case (and, for that matter, in the other cases) is sufficiently reliable to allow the Court to judicially notice the fact of the conviction. *See United States v. White*, 58 F.4th 889, 897 n.4 (6th Cir. 2023).

Fleeing and evading police "involves violent conduct that poses a serious risk of physical injury to others." *United States v. Young*, 580 F.3d 373, 377–78 (6th Cir. 2009) (holding that Michigan fleeing or evading is a violent felony under ACCA's residual clause[8]); *cf. Williams*, 118 F.4th at 660 (crime need not be a categorical crime of violence to indicate dangerousness). Running from a police officer "usually will call the officer to give chase" and "constitutes a clear challenge to the officer's authority." *Young*, 580 F.3d at 377 (quotations omitted). Fleeing, moreover, is "generally aggressive because it typically leads to a confrontation between the offender and the officer." *Id.* at 377–78 (cleaned up and quotations omitted).

Motor vehicle chases almost always present an even greater threat of violence. A fleeing individual might hit other people or vehicles with his own. "[O]ffenders," the Sixth Circuit has explained, "typically attempt to flee by any means necessary, including speeding, extinguishing lights at nighttime, driving the wrong way, weaving, etc." *Id.* at 378 (footnote omitted); *see also United States v. West*, 550 F.3d 952, 964 (10th Cir. 2008) ("[U]nder the stress and urgency which will naturally attend his situation, a person fleeing from law enforcement will likely drive recklessly and turn any pursuit into a high-speed chase with the potential for serious harm to police or innocent bystanders."). Those actions "nearly always pose a substantial danger to pedestrians, other motorists, passengers, and pursuing officers." *Young*, 580 F.3d at 378. Multiple district courts within this circuit agree. *See, e.g., United States v. Green*, No. 23-cr-20506, 2024 WL 4469090, at *3 (E.D. Mich. Oct. 10, 2024). As one court in the Eastern District put it, "fleeing or evading the police" is a crime in *Williams*'s second category: "not strictly" a crime against the person, but "nonetheless pos[ing] a significant threat of danger." *United States v. Smith*, No. 5:22-cr-42, 2024 WL 4242484, at *3 (E.D. Ky. Sept. 19, 2024) (quoting *Williams*, 113 F.4th at 659); *United States v. Hales*, No. 23-cr-20645, 2024 WL 5168632, at *4 (E.D. Mich. Dec. 19, 2024) ("[O]ne of Hales' convictions—felony fleeing or evading in the third degree—is a crime in *Williams*' first category which were directly dangerous to others.").

First-degree fleeing and evading, therefore, falls comfortably among the offenses that *Williams* treated as categorically indicative of dangerousness. Because such a violation necessarily "puts someone's safety at risk," it "justif[ies] a finding of danger" sufficient to support Congress's disarmament determination. *Williams*, 113 F.4th at 659. The Court would reach this conclusion regardless of which aggravating circumstance (or circumstances) apply. Each of them—domestic violence, substantial physical harm, a suspended license, or driving under the influence—increases the *degree* rather than changes the fact of dangerousness involved in evading the police.

---

[8] The Supreme Court later held ACCA's residual clause unconstitutionally vague in *Johnson v. United States*, 576 U.S. 591 (2015).

*See* K.R.S. § 520.095(1).  The act of flight by motor vehicle is itself what gives the crime its dangerous nature; these aggravators only intensify that potential risk.

The Sixth Circuit's decision in *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024), supports this conclusion.  *See* United States' Notice of Supplemental Authority (DN 19) (discussing *Goins*).  Applying *Williams*, the *Goins* Court held that § 922(g)(1) remained constitutional as applied to defendants presenting a combination of three "very specific" factors: 1) a "violation of [a] state probation condition that prohibited [the defendant] from possessing a firearm at the time he did so," 2) "a relatively short probation sentence for a dangerous crime," and 3) "repeated actions demonstrat[ing] a likelihood of future dangerous conduct."  *Goins*, 118 F.4th at 797.

Each of those conditions is present here.  O'Bannon received a five-year probation term.  *See* Judgment of Conviction, 23-CR-896, at 2; Judgment of Conviction, 22-CR-1915, at 2.  A state judge forbade him from possessing or having access to any weapons.  *See* Judgment of Conviction, 23-CR-896, at 2; Judgment of Conviction, 22-CR-1915, at 3.  Louisville Police found him with the gun in February 2024—only a few months into his 5-year term of probation.  *See* Investigative Report at 1.  O'Bannon's five-year term was "relatively short"—only a year longer than the term in *Goins*.  *See* 118 F.4th at 804.  And O'Bannon has a pattern of fleeing and evading police.  As in *Goins*, O'Bannon's propensity for dangerous crime indicates that he is dangerous under *Williams* and therefore forfeited the right to keep and bear arms that he'd otherwise enjoy under the Constitution.

\*

O'Bannon—it's worth repeating—bears the burden of persuasion.  *Williams*, 113 F.4th at 662.  Yet he barely answers the Government's recounting of his extensive criminal history.  Instead, he responds with two parallel arguments.  First, O'Bannon argues that not all offenses that "entail a risk of serious physical injury or death to any person or property," like O'Bannon's first-degree fleeing or evading convictions, are "crimes of violence" indicative of dangerousness under *Williams*.  Reply (DN 17) at 4.  Second, he narrows his focus to one conviction for third-degree burglary.  Motion to Dismiss (DN 14) at 6 (of all O'Bannon's prior convictions, "only the third degree burglary requires review").  This conviction, he contends, does not indicate dangerousness.  Neither argument succeeds.

O'Bannon first asserts, boldly, that offenses involving "intentional … endangerment of others" are "not enough for *Williams* analysis purposes."  Reply at 4.  He then offers a string of offenses, including "passing a stopped school bus" and "failing to adhere to required health and safety standards."  Those examples, the argument goes, demonstrate that a person's offense can put others' safety in danger yet not be dangerous under *Williams*.  *Id.*

7

This argument fails on numerous grounds. First, under *Williams*, a prior offense need not be a "categorical matc[h]" to a violent crime to show a defendant is dangerous. 113 F.4th at 660 (quotation omitted). So O'Bannon's argument that his offense isn't a categorical "crime of violence" fails at the outset. Second, O'Bannon seems to conflate violence and dangerousness. The *Williams* inquiry addresses the latter. *See United States v. Bell*, No. 2:20-cr-20336---  F. Supp. 3d ---, 2024 WL 4589812, at *5 (E.D. Mich. Oct. 28, 2024) ("the use of violence during prior" otherwise dangerous offenses "is not a prerequisite for finding a person dangerous and disarming him"); *Williams*, 118 F.4th at 659 ("These crimes do not always involve an immediate and direct threat of violence against a particular person."); *see also United States v. Keller*, No. 3:24-cr-5, 2024 WL 4800188, at *7 (E.D. Tenn. Nov. 15, 2024) (distinguishing between propensity for violence and dangerousness). The examples he cites are not necessarily *violent* crimes, but they may nonetheless bear on dangerousness. Third, *Williams* directs courts to make a "fact-specific" inquiry turning on "the unique circumstances of the individual defendant." 113 F.4th at 660. As the fact of O'Bannon's first-degree fleeing or evading convictions shows, his crimes put others at others at risk, even if he didn't specifically intend to do so.

O'Bannon's second argument contends that his third-degree burglary conviction doesn't indicate that he's dangerous. That is true, but ultimately unavailing—because the Court needn't rely on this conviction to establish his dangerousness. The commentary to Kentucky first-degree burglary offense notes that third-degree burglary lacks certain elements "indicative of an offender's potential dangerousness." *See* 1974 Kentucky Crime Commission Commentary to K.R.S. § 511.020 (Burglary in the First and Second Degrees). The third-degree variant, unlike more serious offenses, doesn't require that the burglar be armed, cause a physical injury, threaten an occupant, or enter a dwelling house. K.R.S. § 511.020. Any burglary, of course, "creates the possibility of a face-to-face confrontation between the burglar and a third party … who comes to investigate"— regardless of whether the third party is inside the building during the crime. *United States v. Taylor*, No. 3:22-cr-22, 2023 WL 1423725, at *3 (E.D. Ky. Jan. 31, 2023) (quotations omitted). But based on the commentary cited above, that offense isn't necessarily "dangerous" within the meaning of the Sixth Circuit precedents mentioned above.

Unfortunately for O'Bannon, the legal circumstances of his burglary conviction don't bear on the factual reality of his fleeing-and-evading convictions.

\*   \*   \*

The record before the Court shows O'Bannon to be a dangerous felon subject to lawful disarmament by the federal government. So Congress has lawfully disarmed

8

him under § 922(g)(1)—consistent with the Second Amendment. The Court accordingly denies his motion to dismiss the indictment.